IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DENICE TWIGG,

   Plaintiff,

      v.                                                         Case No. 08-2632-JTM

HAWKER BEECHCRAFT CORPORATION,

   Defendant.

## MEMORANDUM AND ORDER

This matter is before the court on defendant Hawker Beechcraft Corporation's (HBC) motion for summary judgment. (Dkt. No. 58). The plaintiff, Denise Twigg, filed this action against HBC, her former employer, on December 12, 2008 (Dkt. No. 1), alleging: 1) interference and retaliation claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; 2) retaliation under the Employment Retirement Income Security Act. ("ERISA"), 29 U.S.C. §1001 *et seq.*; and 3) retaliation under 42 U.S.C. § 1981. (Dkt. No. 64 at 1).

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that

the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56 (c), the party opposing summary judgment must do more than show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Twigg worked for HBC from April 2, 1996 to April 7, 2008, when she was involuntarily terminated. Twigg's immediate supervisor was Cindy Ealey, who reported to Kathy Sade. Kathy Sade reported to Nigel Gray. Gray died on June 1, 2006, and his position was not immediately filled. Greg Graber was eventually promoted to the position that Gray held. Nita Long was HBC's director of compensation and benefits, and oversaw the FMLA program at the time of Twigg's termination. Amber Cotton worked in the human resources department, and assisted Long with FMLA-related matters. Candye Daughhetee worked in the human resources department, and was involved in the decision to terminate Twigg's employment. Plaintiff was always a non-exempt

2

employee, and was never part of the bargaining unit, which is represented by the International Association of Machinists and Aerospace Workers.

Twigg received a copy of the attendance policy and rules of conduct when she went through new employee orientation in 1996. The rules of conduct provide that an absence of three consecutive working days without proper notification will be sufficient grounds for disciplinary action. The disciplinary action ranges from reprimand to immediate termination, based on management's judgment of the seriousness of the offense.

HBC provides short term disability ("STD") coverage to its employees. The coverage provides income replacement equal to seventy-five percent of the employee's weekly wage, for up to twelve weeks. Employees may purchase additional coverage, which provides income replacement equal to twenty-five percent of the employee's wage. Twigg purchased the optional additional STD coverage through Metropolitan Life ("Met Life") on January 19, 2004.

Twigg used her STD coverage when she had liposuction and "tummy tuck" surgery in 2004. Her supervisors knew she used STD benefits during her absence, and she did not suffer any adverse consequences from HBC as a result of it. Twigg never heard any other employee say they believed they were being punished for using STD benefits. She does not know if an employee's use of STD benefits costs HBC.

HBC made a FMLA brochure available to all employees. The brochure explains the employee's obligations, including the warning that until an employee receives formal notification that the employee's family leave has been approved, he/or she must properly report an absence to the department every day. "Proper reporting" is defined as reporting prior to the beginning of your shift.

Twigg alleges she was retaliated against because she complained that an African-American co-worker (Teresa Cole) was being discriminated against due to her race. She testified that she complained to Ealey regarding Cole's treatment in the spring of 2007. Twigg does not recall hearing Sade, Ealey or Schlegel make any remark that referenced an employee's race. She is uncertain as to whether she ever told Ealey that she thought Cole was being treated unfairly due to her race. In late 2007 or early 2008, Twigg said she told Ealey that Cole should be given paid vacation, and that her requests for time off were being unfairly denied. Twigg never complained directly to Sade or Schlegel regarding Cole's situation. Twigg admits that Sade never said that Ealey had mentioned Twigg's complaints regarding Cole, or that Ealey ever told Twigg that she told Sade about Twigg's complaints.

Twigg was expected to be at work at 8:00 a.m., but she had an ongoing problem with tardiness. Twigg's performance review in May 2007 noted that excessive tardiness continued to be a problem in the first half of 2006, and it was an area that she needed to continue to improve.

An employee's death left a position open in Twigg's department. A hiring requisition could be opened only if management was replacing an employee or had justification for adding a new position. Management oriented the position toward electronic publications, specifying a bachelor's degree, or two years of college and ten years of related work experience in web and computer applications and customer support as position qualifications. The human resources department determined the basic experience and educational requirements for salaried and nonexempt positions.

Twigg has a high school diploma, but not two years of college. Her supervisors told her on several occasions that if she wished to be promoted, she needed to earn a bachelor's degree. HBC

prefers to place degreed employees into salaried or nonexempt positions. HBC provides tuition assistance to its employees, but Twigg never used it.

HBC advertised the job opening and received applicants from both HBC employees and non-employees. Sade, Ealey and Sharon Schlegel comprised the interview team. Some applicants were eliminated without an interview; Twigg was one of eight candidates interviewed. Each interview team member ranked the applicants from one to ten in categories of web/job related experience, personality, computer skills, team fit, and overall interview. John Beasley had an overall rating of 10. Three other applicants rated higher than Twigg, who had an overall rating of 5.8. HBC offered John Beasley the position on October 17, 2007. He accepted the offer, and did exemplary work for HBC until July 2008, when he went to work for Cessna.

On February 19, 2008, Twigg submitted a request for FMLA leave, which was to begin the next day. Twigg's supervisor reminded her to turn in her FMLA request. She requested leave from February 20 through April 17, 2008. The physician's certification submitted with the request for leave identified the diagnosis as bunion right foot. The probable duration of the condition was three months. The doctor indicated that Twigg could perform non-weight bearing work. The doctor did not indicate that there were any essential job functions that Twigg would be unable to perform based on her surgery or recovery. Twigg testified that with the use of e-mail and telephone, she would have been able to eliminate most of the walking in her department.

When Twigg called her supervisor, Ealey, she was told that she was only approved for FMLA leave through February 29, 2008. Ealey said Twigg told her not to worry, she was sure the leave would be extended when she went back to the doctor on February 28, 2008.

5

Afer the bunion was removed, Twigg went to her parents' home to recover. She stayed there for a week or ten days. Twigg's parents live only live a few blocks from her home, and she made arrangements to pick up her mail each day.

Twigg applied for STD benefits from Met Life. On March 14, 2008, Met Life notified HBC that it had approved Twigg for STD benefits through April 1, 2008. If an employee who has applied for FMLA is approved for STD benefits, HBC's practice is to approve FMLA leave for the same period of time. HBC sent a notice to Twigg's department and her home address notifying her it had approved FMLA leave through April 1, 2008.

Twigg claims she never received any written notice regarding approval. She was in contact with Met Life, and knew it was awaiting information on her claim.

HBC expected Twigg to return to work on April 2, 2008. She did not return to work on that day nor did she call her supervisors to explain her absence. HBC considered Twigg's failure to return to work on April 2, 3, and 4, 2008, as absences on three consecutive working days without proper notification.

On April 1, 2008, Sade sent an email to Cotton and Daughhetee, stating "I have not heard that Denice's STD is approved past today so I assume she will be at work tomorrow. If anyone knows anything different please let me know." (Dkt. No. 64 at 17). Amber Cotton checked with Met Life to see if Twigg's STD benefits had been extended. Twigg had not requested the STD benefits be extended past April 1, 2008, and that was the date the benefits ended.

On April 7, 2008, Sade sent Twigg a certified letter, notifying her that she was terminated for violation of Rule of Conduct No. 1. On April 9, 2008, the post office attempted delivery of the certified letter. After Twigg was notified that someone was trying to send her a certified letter, she

6

emailed Ealey on April 15, 2008, informing her that she planned to return to work on April 21, 2008. Ealey and Sade let Daughhetee know that Twigg had emailed regarding returning to work. Daughhetee called and emailed Twigg asking her to contact her right away. Twigg did not pick up the certified letter until April 17, 2008. On the same date, Brian Landwehr told Twigg she had been terminated.

On April 16, 2008, Met Life had notified Twigg that due to her failure to provide requested information regarding her status, the claim for benefits was closed effective April 1, 2008. On that same date, Met Life informed HBC that the file was closed because no medical information was received. HBC did not consider the fact that Twigg received STD benefits in its decision to terminate her employment.

On April 16, 2008, Twigg's doctor faxed a chart note to Met Life regarding his April 11 examination of Twigg. On April 17, 2008, Met Life notified Cotton that Twigg's STD benefits were being extended through April 20, 2008. On April 17, 2008, Twigg called Sade about why she was terminated. Sade told her that her FMLA had not been approved past April 1, and she was basically a no-show. Twigg said no one told her about it, and Sade reminded her that Cotton had informed her that her FMLA was only approved through April 1st. Twigg said she thought she could get it changed.

In June 2008, Twigg filed a complaint with the Equal Employment Opportunity Commission. She alleged that she was not selected for the Customer Service Admin II position due to her gender and age. Twigg also alleged that she was retaliated against for complaining about gender and age discrimination. She did not mention that she was not selected for the position because she

complained about how Cole's supervisors treated Cole. Twigg has not asserted gender and age discrimination claims in this case.

Twigg claims:

> (1) HBC interfered with exercise of her rights under the FMLA by terminating her employment.
>
> (2) HBC retaliated against her by refusing to promote her, terminating her employment, and refusing to rehire because she requested leave under the FMLA
>
> (3) HBC retaliated against her by refusing to promote her and terminating her employment because she complained to a supervisor that a co-worker was being discriminated against due to the co-worker's race.
>
> (4) HBC retaliated against her by terminating her employment because she received short-term disability benefits.

(Dkt. No. 49 at 14).

The court considers each claim separately.

**MIXED-MOTIVE ANALYSIS**

As a threshold matter, the court addresses Twigg's suggestion that a "mixed-motive" analysis is appropriate. This mixed-motive analysis applies only in cases where the decision "was the product of a mixture of legitimate and illegitimate motives," and therefore does not implicate the burden-shifting analysis described in *McDonnell Douglas*. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 (1989). Instead, the employer's burden under *Price Waterhouse* is properly deemed an affirmative defense to the plaintiff's showing that defendant relied in part on discriminatory criteria to terminate his employment. *Id.* In *Desert Palace, Inc. v. Costa,* the Supreme Court clarified that

8

a plaintiff was not required to present direct evidence of discrimination, but could proceed on a mixed-motive theory with only circumstantial evidence. 539 U.S. 90, 101 (2003).

In this case, plaintiff has not brought a claim based on a mixed-motive theory. (Dkt. No. 49 at 14 - 17). One of the sections of the Pretrial Order specifically states "defendant did not act for any legitimate non-retaliatory reason when it did not promote plaintiff, terminated plaintiff . . . ." (Dkt. No. 49 at 16). Although Twigg contends that she can prove her claims by both direct and circumstantial evidence, the mixed-motive analysis is not mentioned anywhere in the Pretrial Order. (*Id.* at 14 - 17). The pretrial order "measures the dimensions of the lawsuit, both in the trial court and on appeal." *Hullman v. Bd. of Trustees of Pratt Cmty. Coll.*, 950 F.2d 665, 668 (10th Cir. 1991) (quotation omitted). Absent any motion to amend or modify the Pretrial Order, plaintiff cannot include a mixed-motive claim in this action. *Id.* In any event, as discussed below, the court finds Twigg failed to present either direct or circumstantial evidence that retaliation played a motivating factor in HBC's decision to not promote her, or to terminate her employment, making such an analysis both unnecessary and inappropriate.

A mixed-motive case is not established, and the *Price Waterhouse* framework does not apply, until the plaintiff presents evidence that directly shows retaliation played a motivating part in the employment decision at issue. *See Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir. 1999). A plaintiff can establish retaliation "directly" under *Price Waterhouse*, through the use of direct or circumstantial evidence. *Id.* at 550. In a mixed-motive case, the plaintiff must demonstrate "that the alleged retaliatory motive 'actually relate[s] to the question of discrimination in the particular employment decision'" and may do so through the production of either direct or circumstantial evidence. *Id.* (quoting *Thomas v. Nat'l Football League Players Ass'n,* 131 F.3d 198,

9

204 (D.C.Cir.1997)). Although circumstantial evidence is sufficient to establish that the employer was motivated by retaliatory animus, circumstantial evidence must be tied "directly" to the retaliatory motive. *See Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1512 (10th Cir.1997) ("a plaintiff will be entitled to the burden-shifting analysis set out in *Price Waterhouse* upon presenting evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude" (alteration in original) (quotations omitted)).

Twigg relies on four pieces of circumstantial evidence to support her claim (Dkt. No. 64 at 30): (1) the false explanations given by HBC regarding its adverse employment actions (refusing to promote and termination); (2) the close temporal proximity between her protected conduct and termination; (3) the inconsistencies or contradictions in HBC's explanations regarding her termination; and (4) the deviations from normal company procedure regarding approval of FMLA leave for the same period of time as Met Life approved STD benefits. (Dkt. No. 64 at 25 -27). These assertions are not supported by the facts in the record. None are direct evidence of retaliation, as they are not retaliatory on their face, and would require an inference of retaliatory motive on the part of the HBC. *See Riggs v. AirTran Airways, Inc.,* 497 F.3d 1108, 1117 (10th Cir.2007) ("direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption" (internal quotation omitted)).

Twigg also fails to establish directly that retaliatory animus played a motivating part in HBC's decision to not promote her or to terminate her. The evidence Twigg relies on does not resemble the evidence of conduct or statements by a decisionmaker that the Tenth Circuit has previously held sufficient to satisfy a plaintiff's burden of directly showing retaliatory motive. *See, e.g., Thomas,* 111 F.3d at 1512 (holding that plaintiff was entitled to a mixed-motive instruction

when people involved in the promotion decision expressly stated that plaintiff would not be considered due to his discrimination complaint); *Kenworthy v. Conoco,* 979 F.2d 1462, 1471 n. 5 (10th Cir.1992) (holding evidence was sufficient to warrant a mixed-motive instruction when there was testimony that a supervisor held plaintiff's EEOC filing against her, falsified and altered her performance evaluations, and misrepresented incidents involving plaintiff, and a manager testified that he relied on a misrepresented incident in his decision not to promote plaintiff).

**INTERFERENCE UNDER FMLA**

The FMLA provides that employees are eligible to take up to twelve work weeks of FMLA leave during a twelve-month period, when an employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). To establish a prima facie FMLA interference claim, Twigg must show: "(1) that [s]he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with h[er] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of h[er] FMLA rights." *Jones v. Denver Pub. Sch.,* 427 F.3d 1315, 1319 (10th Cir.2005).

In order to satisfy the second element of an interference claim, the employee must show that she was prevented from taking the full twelve weeks of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave. *See, e.g., Metzler v. Fed. Home Loan Bank of Topeka,* 464 F.3d 1164, 1181 (10th Cir.2006) (holding that second element is satisfied when "FHLB interfered with [Metzler's] right to take up to the twelve weeks to which she was entitled under § 2612(a)(1) and denied her the right to be reinstated to her former position or an equivalent one upon her return to full-time work"); 29 C.F.R. § 825.216(a)(1).

HBC maintains that Twigg cannot prove a prima facie case because she was not entitled to FMLA leave after April 1, 2008, she was not denied any substantive rights, and she cannot prove a casual connection between an entitlement to leave and the denial of a substantive right.

If an employee fails to substantiate the existence of a serious health condition by submitting an appropriate physician's certification, then "the leave is not FMLA leave." *See Allender v. Raytheon Aircraft Co.*, 339 F.Supp.2d 1196, 1205 (D.Kan. 2004) (plaintiff who failed to provide a certification substantiating a serious health condition properly denied leave), *aff'd*, 439 F.3d 1236 (10th Cir. 2006). There is no evidence that Twigg had a serious health condition, therefore she does not satisfy the first element necessary to establish a prima facie case. Twigg provided certification that she was having a bunion removed on February 20, 2008. Twigg's physician noted that she could perform non-weight bearing work, and did not specify that there were any essential job functions that Twigg was unable to perform, as long as she was in a sitting position. Her certification did not establish the need to be off work for eight weeks. The record reflects that non-weight bearing work was available to Twigg, which is the only limitation her physician required. Twigg's physician never opined that she was incapacitated from performing her regular duties.

There is no evidence that HBC interfered with Twigg's right to take FMLA leave. In fact HBC authorized FMLA leave from February 20, 2008 until April 1, 2008, in spite of her doctor's medical opinion that she could perform the duties of her position with a non-weight bearing accommodation. Therefore Twigg also fails to satisfy the second element necessary to establish a prima facie case.

Even if the court were to assume that Twigg established the first and second elements necessary for a prima facie case, she fails to establish the third element, a correlation between the

alleged adverse action and her exercise of FMLA rights. HBC maintains that Twigg was terminated for her violation of the company policy regarding notice of absences. A reason for dismissal that is insufficiently unrelated to a request for an FMLA leave will not support recovery under an interference theory. *Smith v. Diffee Ford-Lincoln-Mercury,* 298 F.3d 955, 961(10th Cir.2002) (an indirect causal link between dismissal and an FMLA leave is an inadequate basis for recovery); *Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1262 (10th Cir.1998) (to withstand summary judgment on an interference theory, an employee's termination must have been related to her request for an FMLA leave).

HBC authorized FMLA for Twigg in 2004 and 2008. In 2004, HBC authorized six weeks of FMLA for Twigg's elective cosmetic surgery (liposuction and "tummy tuck"), and in 2008 HBC authorized approximately six weeks of FMLA for removal of a bunion. There is no evidence that HBC terminated Twigg based on her request for FMLA leave. Twigg's assertion that HBC allowed her to take FMLA leave for approximately six weeks, specifically until April 1, 2008, and then decided to terminate her when she was scheduled to return to work based on her use of FMLA leave is unsupported. The court finds that Twigg fails to articulate a prima facie case that HBC interfered with her FMLA leave entitlement, and summary judgment is appropriate on this claim.

**RETALIATION UNDER FMLA**

The FMLA provides that employees are eligible to take up to twelve work weeks of FMLA leave during a twelve-month period, when an employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It also prohibits an employer from retaliating against an employee who exercises his or her rights under the FMLA. 29 U.S.C. § 2615(a)(2). Retaliation claims under the FMLA are

13

subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973), in which, if the plaintiff can establish a prima facie case of retaliation, the defendant must offer a legitimate, non-retaliatory reason for the employment action. The plaintiff must then demonstrate that the defendant's reason is pretextual. *Id.*

To prove a prima facie case of retaliation, Twigg must show that: (1) she engaged in a protected activity; (2) HBC took an action that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the adverse action. *Metzler,* 464 F.3d at 1171.

In this case, HBC concedes that Twigg engaged in the protected activity of requesting, receiving, and using FMLA leave. (Dkt. No. 73 at 91). HBC also concedes that failure to promote, termination, and failure to rehire are all adverse job actions. (*Id.*) Thus, the court finds she has met the first and second elements of her prima facie retaliation claim.

HBC maintains that Twigg has not proven a causal connection between the protected activity and the adverse action, which is the third element of the prima facie retaliation claim.

Twigg was not promoted in October 2007, but she did not request FMLA until February 2008; therefore, it is abundantly clear there is no casual connection between HBC's decision not to promote Twigg in October 2007, and a FMLA request that occurred months later.

HBC's decision to terminate Twigg in April 2008 was the result of the application of its notice of absence policy. *See Bones v. Honeywell Int'l. Inc.,* 366 F.3d 869, 877-78 (10th Cir.2004). Twigg knew of the company's notice of absence policy, and failed to comply with it. She did not return to work following the expiration of her approved FMLA leave. Twigg was scheduled to

return to work on April 1, 2008, but did not return to work on April 2, 3, and 4, 2008, and did not notify HBC that she would not be coming to work. There is no evidence that any HBC employee who did not use FMLA, but violated the company policy by being absent for three consecutive days without proper notification was treated differently. The FMLA does not prevent an employer from enforcing attendance polices, such as those governing giving notice, even if the underlying absence might otherwise be FMLA-qualified leave. *See Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1324-25 (10th Cir.1997).

HBC maintains that Twigg has not proven a causal connection between the protected activity and the adverse action, which is the third element of the prima facie retaliation claim. Twigg has not raised a genuine issue of material fact undermining HBC's stated reasons for terminating her employment. The analysis centers on whether Twigg has come forward with evidence of a causal relationship between her termination and FMLA leave. The record shows HBC authorized FMLA leave over the course of Twigg's employment, specifically she was allowed FMLA leave for an elective cosmetic procedure in 2004, and suffered no adverse consequences, and in 2008 HBC granted approximately six weeks of FMLA leave, in spite of Twigg's treating phsycian indicating she could perform the duties of her job after the bunion surgery. Twigg's assertion that HBC allowed her to take FMLA leave for approximately six weeks, specifically until April 1, 2008, and then decided to terminate her when she was scheduled to return to work, based on her use of FMLA leave, is illogical. No genuine issue of material fact exists with respect to HBC's reason for terminating Twigg. The court finds that summary judgment is appropriate on this claim.

**RETALIATION UNDER ERISA**

Allegations of ERISA retaliation are also analyzed using the burden-shifting framework of

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kinkead v. Southwestern Bell Telephone Co.,* 49 F.3d 454, 456 (8th Cir.1995).

The court finds Twigg fails to establish a prima facie case of ERISA retaliation in that she did not demonstrate circumstances which would give rise to an inference of discrimination. Twigg alleges that HBC terminated her based on her use of STD. Met Life administers the STD claims; there is no evidence that an STD claim has any financial impact on HBC. Twigg admits that she is unaware of any financial impact on HBC based on an employee's STD use. Twigg was on STD benefits from February 20, 2008 until April 1, 2008. Twigg acknowledges she did not suffer any adverse consequences after she used six weeks of STD in 2004 for cosmetic surgery. At the time HBC decided to terminate Twigg, Met Life had notified HBC that Twigg was no longer eligible for STD benefits, based on her failure to timely respond to Met Life's requests for information. Twigg has not alleged any justification for her belief that HBC terminated her based on her use of STD.

But even if Twigg had presented a prima facie ERISA retaliation case, summary judgment would still be appropriate because she fails to demonstrate that HBC's proffered rationale is pretextual. HBC maintains that it terminated Twigg for her failure to comply with the company policy regarding notice for absences, and there is no evidence to the contrary.

No facts in the record suggest that HBC's decision was a mask for retaliation. HBC approved six weeks of FMLA in 2004 for cosmetic surgery, and approximately six weeks in 2008 for bunion surgery. Met Life, the company that administers the STD, approved STD for the full period in 2004 and 2008. Because the uncontroverted evidence fails to show that HBC's reason for terminating Twigg was pretextual, summary judgment is appropriate on this claim.

**RACIAL DISCRIMINATION CLAIM**

42 U.S.C. § 1981 encompasses retaliation claims. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008). A non-minority employee may bring a cause of action under 42 U.S.C. § 1981 for retaliation precipitated by the plaintiff's efforts to vindicate the rights of minority employees. *See Skinner v. Total Petroleum, Inc.,* 859 F.2d 1439, 1447 (10th Cir. 1988). The test for establishing a prima facie case for retaliation is the same under both Title VII and 42 U.S.C. § 1981. *See Roberts v. Roadway Exp., Inc.,* 149 F.3d, 1098, 1103 n. 1 (10th Cir.1998); *Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1513 (10thCir.1997). The court applies the three-part *McDonnell Douglas* test. *See Penry v. Fed. Home Loan Bank of Topeka,* 155 F.3d 1257, 1263-64 (10th Cir.1998). The formula is essentially the same as utilized in the FMLA and ERISA retaliation claims, requiring the plaintiff to first establish a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802. Should the plaintiff succeed in proving a prima facie case, the employer must provide a legitimate and facially non-discriminatory reason for its decision. *Id.* Finally, if the employer satisfies this burden, the plaintiff must establish that the defendant's reasons were a pretext for discrimination. *Id.* at 804.

In order to establish a prima facie case of retaliation, plaintiffs must show that "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1202 (10th Cir.2006).

HBC asserts that Twigg "cannot prove the first element of a prima facie case - that she engaged in protected activity." (Dkt. No. 58 at 29). Twigg was terminated in spring 2008, but she alleges the protected activity occurred "sometime in 1996" and in spring 2007. Twigg alleges she complained to Nigel Gray in 1996 that she heard Pat Tos make a remark that African-American

employees were lazy, and in spring 2007, she complained to Cindy Ealey about how she perceived Teresa Cole was being treated. Twigg admitted she did not recall telling Ealey that she thought Cole's supervisor's decisions were racially discriminatory. Complaining about an issue that involves a minority employee is not the same as complaining that a minority employee's rights are being infringed due to their race. *See Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008) (complaints that do not implicate unlawful discrimination are not protected opposition for purposes of retaliation claim). There is no evidence before the court that Twigg's complaints alleged racial discrimination, therefore the complaints are not protected activity under 42 U.S.C. § 1981.

Even if the court assumed that Twigg's complaints were protected activity, there is no evidence of a casual connection between the complaints and the adverse employment activity. As noted previously, HBC concedes that not being promoted and being terminated qualify as materially adverse job actions. (Dkt. No. 58 at 30). The issue is whether either of the adverse employment activities standing alone is sufficient to establish causation. *See Anderson v. Coors Brewing Co.* 181 F.3d 1171, 1179 (10th Cir. 1999).

The closer the adverse employment activity occurred to the protected activity, the more likely it will support a showing of causation. *Compare Ramirez v. Oklahoma Dept. Of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (one and one-half month period between protected activity and adverse action may, by itself, establish causation), *overruled in part on other grounds, Ellis v. University of Kansas Med. Ctr.*, 163 F.3d 1186, 1194-98 (10th Cir. 1998)**,** *with Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three-month period, standing alone, is insufficient to establish causation). Retaliatory motive may be inferred when an adverse action closely follows

protected activity. *Chavez v. City of Arvada,* 88 F.3d 861, 866 (10th Cir.1996). However, unless the termination is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation. *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997).

The complaint in 1996 is quite remote from the two adverse employment actions that Twigg alleges, which occurred in 2007 and 2008, respectively. Twigg maintains she complained in 1996 to Gray about how she perceived Cole was being treated. Gray died in 2006, which was more than a year before Twigg was not promoted, and almost two years before Twigg was terminated. Gray was not involved in either of the adverse employment actions, and there is no evidence that Twigg or Gray reported her 1996 complaint to anyone. Thus, no evidence connects the 1996 complaint with Twigg not being promoted in October 2007, or her termination in April 2008.

Although less remote, the complaint in spring 2007 predates by approximately six and twelve months the two adverse employment actions Twigg alleges. Beyond the lack of proximity of months, there is no evidence tying Twigg's complaint to Ealey in spring 2007 to Twigg not being promoted in October 2007 or her termination in April 2008. Further, there is no evidence that the decision-makers for the promotion in October 2007 and the termination in April 2008 had any knowledge of, or were motivated in any way by complaints Twigg made in 1996 or spring 2007.

The evidence indicates that Twigg was not promoted in October 2007 because she did not have the educational qualifications for the position, and she was terminated for her failure to return to work following her approved FMLA leave in April 2008. Twigg did not show she engaged in protected opposition to discrimination, or that a casual connection existed between the claimed protected activity and the materially adverse actions. Twigg was unable to establish two of the three

19

elements necessary to establish a prima facie case of retaliation under 42 U.S.C. § 1981. The court finds that summary judgment is appropriate on this claim.

Because the court reaches the conclusion that HBC is entitled to summary judgment on all claims, it need not reach the additional argument advanced by HBC relating to Twigg's misuse of the company computer, and the effect on her claim for damages.

IT IS ACCORDINGLY ORDERED THIS 21st day of April, 2010, that the defendant's Motion for Summary Judgment (Dkt. No. 58) is granted.

s/ J. Thomas Marten

J. THOMAS MARTEN, JUDGE